IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Brooke Hancock,<br><br>                    Plaintiff,<br><br>    vs.<br><br>Carolyn W. Colvin,<br>Commissioner of Social Security,[1]<br><br>                    Defendant. | Civil Action No. 6:12-3526-DCN-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on January 8, 2010, alleging that she became unable to work on January 1, 2009. She later amended her alleged disability onset date to December 9, 2009. The application was denied initially and on reconsideration by the Social Security Administration ("SSA"). On September 2, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"),

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

before whom the plaintiff and Benson Hecker, Ph.D., an impartial vocational expert, appeared on June 23, 2011, considered the case *de novo* and on September 20, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 16, 2012. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> (2) The claimant has not engaged in documented substantial gainful activity since December 9, 2009, the amended alleged onset date (20 C.F.R § 404.1571 *et seq*).
>
> (3) The claimant has the following severe combination of impairments: connective tissue disorder and Raynaud's syndrome (20 C.F.R. § 404.1520(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a wide range of light work as defined in 20 C.F.R. § 404.1567(b). I find claimant can occasionally lift or carry 10 pounds, frequently lift or carry 5 pounds, sit for 6 hours of an 8 hour workday, and stand or walk for 6 hours of an 8 hour work day. I also find [claimant] can frequently balance and occasionally climb, stoop, kneel, crouch, and crawl. I further find claimant should avoid concentrated exposure to hazards and extreme heat and avoid all exposure to extreme cold.
>
> (6) The claimant is capable of performing past relevant work as office manager and bookkeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

> (7) The claimant has not been under a disability, as defined in the Social Security Act, from December 9, 2009, through the date of this decision (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

4

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on July 22, 1970, and she was 39 years old on her amended alleged onset date of disability and 41 years old on the date of the ALJ's decision (Tr. 21, 10, 31, 148). She has a master's degree in early education and past relevant work as an office manager, bookkeeper, and teacher (Tr. 31, 63).

### *Prior to Alleged Onset Date*

On October 2, 2007, Caroline R. Price, M.D., evaluated the plaintiff as a new patient for complaints of a face rash over the preceding six months. The plaintiff also complained of an intermittent rash on her right hand. Dr. Price noted that the plaintiff had a history of positive antinuclear antibody ("ANA") testing and was being managed on prednisone intermittently for flares. Dr. Price took a skin biopsy and prescribed Metrolotion and Adoxa (Tr. 242-44). On October 9, 2007, Dr. Price evaluated the plaintiff in follow-up and diagnosed morphea. Dr. Price explained that morphea is localized scleroderma and discussed with the plaintiff its possible associations with other autoimmune processes. Dr. Price noted that the plaintiff was also having a slight sticking sensation in her throat when she swallows small things. She diagnosed possible early esophageal problems resulting from her condition and recommended that the plaintiff receive further evaluation (Tr. 245).

On March 12, 2009, the plaintiff was evaluated by Dr. Amir Agha of Foothills Rheumatology. Dr. Agha's records are handwritten and difficult to read. Dr. Agha noted that the plaintiff had a questionable malar rash for three weeks. He noted arthralgia and myalgias and positive Raynaud's symptoms. The plaintiff's medications were Ultram and Lortab. Dr. Agha diagnosed unspecified diffuse connective tissue disease and refilled her medications (Tr. 263). On July 20, 2009, Dr. Agha evaluated the plaintiff for hip pain. Dr.

Agha noted that she had arthralgia and myalgia. He diagnosed unspecified diffuse connective tissue disease, enthesopathy of hip, and pelvic joint pain (Tr. 262).

On August 23, 2009, the plaintiff was treated in the emergency room for complaints of rapid heart rate, chest pain, and shortness of breath. She was diagnosed with tachycardia and systemic lupus erythematosus ("SLE"). She was advised to stop taking prednisone and seek follow-up treatment (Tr. 246-60).

On August 24, 2009, David C. Silkiner, M.D., the plaintiff's family physician, reevaluated her. Dr. Silkiner indicated that the plaintiff had "a little more trouble lately with fatigue and also some hip pain." Dr. Silkiner noted that Dr. Agha gave the plaintiff a cortisone injection in her hip three weeks prior, giving her some temporary relief. The plaintiff reported feeling better after finishing a steroid dose pack but then developed a racing heart with profound weakness causing her to go to the emergency room. The plaintiff continued to feel these symptoms, which were worse when she stood up. Dr. Silkiner indicated that the plaintiff continued to look "slightly weak." Dr. Silkiner indicated that the plaintiff's symptoms could have been an Addisonian crisis from steroid withdrawal. He restarted the plaintiff on prednisone with a taper over several weeks (Tr. 299).

On September 14, 2009, Dr. Silkiner indicated that the plaintiff was "coming around fairly nicely now." She continued to have tachycardia at times, which was not "necessarily exertional." Dr. Silkiner noted that regardless the plaintiff did "tolerate intense exertion very well." The plaintiff reported having difficulty sleeping when she first stopped Ativan but had been "able to wean it." The plaintiff also reported that her symptoms are "worst in early to midafternoon and rarely a problem at night." Dr. Silkiner reviewed the plaintiff's medications and switched her from Wellbutrin SR to Wellbutrin XL. He also advised the plaintiff that in the future if she had "flares or MCTD she should really stick with Dr. Agha." Dr. Silkiner noted that the plaintiff was working but could only work one day as a substitute teacher and then was "fairly exhausted over the next couple days." The plaintiff

6

also reported doing some bookkeeping for her husband but indicated that she "does it at short spurts and that if she pushes too hard or stays on her feet too long she really is out of commission for a day or two after that." (Tr. 297).

On October 19, 2009, Dr. Agha noted that the plaintiff's pain was fading and her hip pain was better. Dr. Agha noted that the plaintiff's medications were Ultram and Lortab, and he recommended that she continue her medications (Tr. 261).

On November 11, 2009, Robert E. Broker, M.D., another physician in Dr. Silkiner's office, evaluated the plaintiff for complaints of shortness of breath and viral syndrome (Tr. 296).

On December 23, 2009, the plaintiff reported muscle aches, hand swelling, and joint pain (Tr. 295). Dr. Silkiner reported that the plaintiff's hands had a "good response" to the medication prednisone, and, although he assessed "[s]light stiffness and moderate tenderness throughout," he told the plaintiff to slowly increase her activities. The plaintiff complained that Dr. Agha's office was "fairly hard to deal with," and Dr. Silkiner recommended that she see Dr. Merchant. Dr. Silkiner also recommended that the plaintiff keep a journal of her episodes of brief blackouts. The plaintiff reported having these episodes about every 4-8 weeks only when she is standing (*id.*).

*After Alleged Onset Date*

On January 26, 2010, Dr. Silkiner evaluated the plaintiff in follow-up finding that the plaintiff had done well with her last round of prednisone. Dr. Silkiner indicated that the plaintiff's hands "look fairly good." He stated that the plaintiff had "probable mixed connective tissue disease but never really cubby holed into a specific diagnosis." Dr. Silkiner recommended waiting to see Dr. Merchant's opinions in this regard. Dr. Silkiner also recommended a skin survey for the plaintiff's history of dysplastic nevus. He advised the plaintiff to "slowly pick up her activity as tolerated." (Tr. 294).

7

On February 3, 2010, Dr. Silkiner refilled the plaintiff's prescription for tramadol. On February 5, 2010, Dr. Silkiner switched the plaintiff back to Celexa from Zoloft after complaints of feeling irritable, anxious, and having mood swings (Tr. 294).

On February 9, 2010, Gulzer Merchant, M.D., initially evaluated the plaintiff at Dr. Silkiner's request. The plaintiff reported being diagnosed with lupus ten years prior with a rash that lasted for three years. The plaintiff indicated that since 2007 she has suffered from increased fatigue, body aches, and pain. She also reported Raynaud's more with cold and a rash on her chest and hand that showed morphea on biopsy in 2008. The plaintiff indicated that she has flares when she is significantly fatigued and has to rest. She also complained of shortness of breath, rashes on her face and nose, joint pain in her hips and knees, myalgia, and morning stiffness that lasts longer with flares. The plaintiff reported having severe flares twice a year where she has to be in bed but otherwise had aches and pain more frequently. The plaintiff reported a six week period of swelling and hand aching making it hard for her to grip things. Dr. Merchant noted that the plaintiff had started Maxide, which had helped with the swelling. The plaintiff reported having Raynaud's, mouth ulcers more with flares, hair loss, fevers on and off, and sun sensitivity that causes flares and increased achiness. Dr. Merchant noted prior positive ANA test results but indicated that the results were negative at other times. Dr. Merchant noted that the plaintiff's current medications were Ultram, Mobic, Synthroid, Flexeril, Wellbutrin, Maxide, and Lortab. On examination, the plaintiff had mild thickening of the skin and nail fold and capillary changes. Dr. Merchant's assessments included polyarthralgia, connective tissue disease, Raynaud's syndrome, myalgia, and hypothyroid. Dr. Merchant stated that he suspected that the plaintiff's myalgia was related to her connective tissue disease. Dr. Merchant started the plaintiff on Plaquenil (Tr. 338-41).

On February 16, 2010, Dr. Silkiner completed a mental questionnaire at the Commissioner's request indicating that the plaintiff had depression and anxiety. He

indicated that medication had helped the plaintiff's symptoms and that he had not recommended psychiatric care. Dr. Silkiner stated that the plaintiff was appropriately oriented, had a racing thought process, had an appropriate thought content, had a worried, anxious, and a depressed mood and affect, and had good attention, concentration, and memory. Dr. Silkiner stated that the plaintiff had an "obvious" work-related limitation in function due to her mental condition. Dr. Silkiner stated that the plaintiff had "poor tolerance for increased stressors." He also noted that she had "connective tissue disease with chronic pain and fatigue as comorbidity." Dr. Silkiner indicated that the plaintiff would be capable of managing her own funds (Tr. 293).

On a SSA function report dated February 19, 2010, the plaintiff described her activities of daily living. Specifically, she stated that she helped her two children with homework, prepared dinner but with difficulty and with her husband's help, shopped in stores three times per week, attended church weekly, prepared breakfast for her children, arranged their hair, dropped them off at school, "pick[ed] up around the house", made the bed, did laundry, and, when she was having a "good morning," went for a short walk on the treadmill. She further stated that she "ha[d] to take short breaks during 'chores.'" In regards to her impairments, she stated that cold weather caused her lips to turn blue and caused her to lose sensation in her fingers, and that "[s]tress causes my hands to turn white and blue because of the Raynaud's." Additionally, she stated that her hands swelled and ached "a lot" (Tr. 191-201).

On March 11, 2010, Dr. Merchant noted that the plaintiff was "doing well with less joint pain." He indicated that she had mild thickening of the skin and nail fold capillary changes. Due to the plaintiff's complaints of rash and itching, Dr. Merchant recommended that she stop taking generic Plaquenil and start taking the brand form (Tr. 335-37).

On March 29, 2010, a Physical Residual Functional Capacity Assessment was completed by William Hopkins, M.D., a state agency non-examining doctor. He found that

9

the plaintiff was capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. He indicated that the plaintiff could occasionally climb ladders, ropes, or scaffolds; and could frequently perform all other postural abilities. Dr. Hopkins noted that the plaintiff would need to avoid concentrated exposure to extreme heat and to hazards and would need to avoid even moderate exposure to extreme cold.  Dr. Hopkins further opined that the plaintiff's claim of frequent flares was not supported by the medical evidence and that her symptoms were "far in excess of objective findings" (Tr. 269-76).

On April 8, 2010, state agency reviewing psychologist Gary E. Calhoun, Ph.D., opined that the plaintiff had no severe psychological impairment, no limitation in activities of daily living, a mild limitation in concentration, persistence or pace, mild difficulties in maintaining social functioning, and no episodes of decompensation (Tr. 277, 287).  These findings were affirmed in July 2010 by state agency reviewing psychiatrist H. Thomas Unger, M.D. (Tr. 313).

The plaintiff experienced tachycardia in April 2010 after a Pilates exercise class (Tr. 292).  She was evaluated by Dr. Booker on April 13, 2010, for complaints of chest pain, tightness, and anxiety.  He noted that the plaintiff had recently been placed on Plaquenil for her connective tissue disease.  She reported having "a difficult time the last 5-6 days" and needing to be "resting more." The plaintiff had been in the emergency room and was told she was having anxiety symptoms. EKG testing showed sinus tachycardia with a rate of 103.  Dr. Booker diagnosed chest pain with tachycardia and indicated that he felt the plaintiff was having "more anxiety related to her underlying medical problem."  He started the plaintiff on Ativan (Tr. 292).

On April 22, 2010, the plaintiff told Dr. Merchant that her pain was worse (Tr. 332).  The doctor indicated that the plaintiff continued to have joint pain, a low grade fever

10

on and off, and morning stiffness. Dr. Merchant recommended that the plaintiff continue current medications and restarted her on prednisone (Tr. 332-34).

On May 5, 2010, Dr. Silkiner reviewed the plaintiff''s medications, noting that she had not done as well on Elavil because she was not sleeping as well with this medication. The plaintiff also complained of fatigue, indicating that she was unable to work because of her fatigue. The plaintiff' reported having a couple more episodes of chest pain, but she indicated that Ativan had been somewhat helpful. The plaintiff reported that her tension in general was doing fairly well and that her recent flare of her connective tissue disease was "slowly waning." She stated that she actually felt worse than she did last fall, noting that she had "tried taking a part time job, with flexible hours, ten hours a week a couple of hours a day from home" but found she was increasingly unable to complete her activities of daily living while doing this and had to leave that job. Dr. Silkiner stated that the plaintiff' was "getting by fairly well." The plaintiff noted having "some fullness in her throat when she swallows lately, food tends to want to hang and eventually passes on through." Dr. Silkiner diagnosed connective tissue disease and stated the plaintiff' "is more and more felt to have a diagnosis of Sjogren's." He advised continued treatment with Dr. Merchant and weaning her off prednisone. He also advised consultation with Dr. Price for her dysplastic nevus. Dr. Silkiner also diagnosed profound fatigue. He noted that the job that the plaintiff had "attempted was an ideal situation and she would like to work more but certainly is not going to be able to." Dr. Silkiner stated that he felt that applying for disability would certainly be appropriate and that the plaintiff "meets criteria by all ways of looking at it" (Tr. 291-92).

On May 13, 2010, Dr. Merchant reevaluated the plaintiff and noted that she was doing well. The plaintiff continued to have pain in her hips, legs, and neck, as well as occasional shortness of breath. Dr. Merchant refilled the plaintiff's medications and ordered pulmonary testing, which showed mild restrictive lung disease (Tr. 329-31, 347-48).

A Physical Residual Functional Capacity Assessment and Case Analysis were completed by Gregory McCormack, M.D., a non-examining doctor state agency rheumatologist, on July 21, 2010. He found the plaintiff capable of lifting and carrying ten pounds occasionally and less than ten pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. He indicated that the plaintiff could frequently balance and could occasionally perform all other postural abilities. Dr. McCormack noted that the plaintiff would need to avoid concentrated exposure to extreme heat and to hazards and would need to avoid all exposure to extreme cold. Dr. McCormack stated that the plaintiff's impairments were "felt to be more severe than was assessed at the initial level" but did not "meet/equal listing 14.06" (Tr. 304-12).

On August 19, 2010, the plaintiff told Dr. Merchant that "July was worse regarding her flares," which were marked by general fatigue and pain in her hip and legs, but she was currently "doing well with less joint pain," less morning stiffness, and no joint swelling, and her medications were causing no side effects. Dr. Merchant estimated that the plaintiff's pain was satisfactorily controlled and that she was experiencing "vague flares." The plaintiff's pain was still satisfactorily controlled in September 2010, and Dr. Merchant again estimated that she was "doing well" with no joint swelling and less morning stiffness. Dr. Merchant also noted that the plaintiff had mildly thick skin on her hands and periungual hyperemia. Dr. Merchant stated that he suspected that the plaintiff's joint pain myalgias were related to her mixed, undifferentiated connective tissue disease. He reviewed and refilled her medications, including Ultram, Mobic, and Plaquenil (Tr. 319-25).

On August 26, 2010, Stephen Hameroff, M.D., a non-examining state agency ophthalmologist, completed a case analysis affirming the prior agency decision finding the plaintiff's vision impairments non-severe (Tr. 314). On August 30, 2010, Howard Bronstein, M.D., a non-examining state agency physician, completed a case analysis affirming the prior

12

agency decision finding the plaintiff's heart palpitations and gastroesophageal reflux disease ("GERD") to be non-severe (Tr. 315).

In September 2010, Dr. Silkiner opined that the plaintiff could sit for a total of four hours and stand/walk for a total of two hours in an eight-hour workday and that she could occasionally lift/carry up to 20 pounds, but that pain and other symptoms would frequently to constantly interfere with the attention and concentration needed to perform even simple work. Dr. Silkiner also opined that the plaintiff's difficulties would cause her to be absent from work more than three times per month. When asked what "particular medical or clinical findings" supported his opinion, Dr. Silkiner wrote "clinical exam." Dr. Silkiner also indicated that the plaintiff's symptoms lasted or were expected to last twelve months (Tr. 316-18).

On September 27, 2010, Dr. Merchant reevaluated the plaintiff and noted that she was "doing well." The plaintiff continued to have hip and leg pain, periodic low grade fever, and morning stiffness. Dr. Merchant reviewed and adjusted the plaintiff's medications (Tr. 319-21).

On January 27, 2011, Dr. Merchant evaluated the plaintiff and noted that she had a recent flare. Dr. Merchant reviewed and adjusted the plaintiff's medications and referred her to a pulmonary doctor for additional testing (Tr. 344-46). On April 4, 2011, Dr. Merchant reevaluated the plaintiff. Dr. Merchant increased the plaintiff's dose of Plaquenil (Tr. 349-51). Pain was "satisfactorily controlled" as of January 2011, and she was "doing well with less joint pain" in April 2011 (Tr. 344, 349).

*Administrative Hearing*

At the hearing on June 23, 2011, the plaintiff stated that she experiences joint pain in the hips and legs, experiences fatigue, cannot perform simple activities at times, does simple exercises and stretching, experiences hand and joint swelling, does not clean the house, lays down for entire days at times, can be on her feet a couple of hours a day,

can lift a gallon of milk, has problems with concentration, experiences shortness of breath, drives, shops, had seven "flare-ups" so far this year, and experiences drowsiness as a side effect of medication. The plaintiff further testified that she has a Facebook account, prepares meals, dusts, reads, attends church, and attends some of her children's sporting events (Tr. 13-14).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to provide adequate reasons for the credibility determination and (2) failing to give proper weight to the medical opinion of treating physician Dr. Silkiner.

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or

muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White*

15

*v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)   the individual's daily activities;

(2)   the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)   factors that precipitate and aggravate the symptoms;

(4)   the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)   treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)   any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. § 404.1529(c).

The ALJ found that while the plaintiff's underlying impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the residual functional capacity ("RFC") he assessed (Tr. 16-18, 20). Specifically, the ALJ noted that Dr. Merchant's examinations showed normal knee, back, hip, hand, shoulder, and ankle ranges of motion without

swelling or tenderness, normal motor and sensory function, clear lungs, negative straight leg raising, and no active tender points. He further cited Dr. Merchant's reports of negative ANA testing and repeated notations that the plaintiff reported doing well and had no joint swelling and decreased joint pain (Tr. 16). The ALJ further cited medical evidence showing the plaintiff's pain was well controlled in February 2010, and she felt better when she restarted prednisone in April 2011 (Tr. 17). As for the plaintiff's activities of daily living, the ALJ noted that he plaintiff stated she could prepare meals, do laundry, drive, shop, visit with friends, and attend church weekly, and she reported doing Pilates in April 2010 (Tr. 17).

The plaintiff makes several arguments regarding the intermittent nature of her impairment. Specifically, she argues that the ALJ's assessment of her credibility is flawed because he "failed to understand the precise nature of [her] impairments," which have symptoms that can come and go; erred in relying in part upon normal medical findings and negative ANA tests since these are not inconsistent with connective tissue disease; erred in relying on Dr. Merchant's notations that she was "doing well" as this phrase should be viewed in the context of her illness; erred in speculating that she exaggerated in testifying that she had seven flares in 2010-2011; erred in failing to consider the evidence that any increase in activity causes serious decline in her functioning; and erred in relying on her daily activities as the evidence shows she is only able to do those activities on an intermittent basis (pl. brief at 16-23).

Here, there is ample evidence that the plaintiff's connective tissue disease flared several times per year,[3] resulting in joint pain, weakness, fatigue, and shortness of

---

[3] In April 2010, the plaintiff told Dr. Merchant that her most recent flare had been in December 2009 and "this flare happens 2 x yrs" (Tr. 332). There is also an indication in the record that she suffered from one flare in May 2010 (Tr. 291) and another in the first part of January 2011 (Tr. 344). In August 2010, the plaintiff told Dr. Merchant that "July was worse regarding her flares" (Tr. 322), but there is no indication as how many flares occurred in July 2010. The plaintiff testified at the June 2011 hearing that she had two flares so far in 2011 and "probably four or five last year [in 2010]" (Tr. 61). She further testified that the flare in January 2011 "lasted about six weeks" (*id.*). The ALJ stated in his decision: "[Treating physician] Dr. Silkiner's notes from September 2009 report no 'flares' (Exhibit 7F/7 [Tr. 297]), . . . and claimant reported she only had flares twice a year in April

17

breath (Tr. 291-92, 319-23, 329-34, 338-41). The plaintiff also had a history of positive ANA tests (Tr. 242-44, 338-41). Dr. Silkiner opined that the plaintiff could sit for a total of four hours and stand/walk for a total of two hours in an eight-hour workday and that she could occasionally lift/carry up to 20 pounds, but that pain and other symptoms would frequently to constantly interfere with the attention and concentration needed to perform even simple work, and the plaintiff's impairments would cause her to be absent from work more than three times per month (Tr. 316-18). Furthermore, the intermittent nature of the plaintiff's impairment clearly has vocational implications. At the hearing, the vocational expert testified in response to the plaintiff's attorney's hypothetical that there would be no work for a hypothetical claimant who is absent from work three times per year for a week at a time (Tr. 67).

While some evidence may exist to discount the plaintiff's credibility, the undersigned cannot say that the ALJ's decision is based upon substantial evidence given the evidence of the intermittent nature of her condition that the ALJ did not address or acknowledge. *See Totten v. Califano*, 624 F.2d 10, 12 (4th Cir. 1980) ("The ALJ must consider this question and make specific findings on whether [the claimant's] intermittent incapacity constitutes an inability to perform any substantial gainful activity ."). *See also Rosato v. Barnhart*, 352 F.Supp.2d 386, 397 (E.D.N.Y. 2005) (finding ALJ erred in discrediting the plaintiff's testimony based upon "frequent periods of improvement" where her alleged disability was of unpredictable and intermittent nature). Accordingly, the undersigned recommends that the case be remanded to the ALJ for further consideration of the plaintiff's credibility in assessing her RFC with specific consideration of the intermittent nature of her condition. In light of the court's recommendation that this matter be remanded

---

2010 (Exhibit 14F/14 [Tr. 332]). Her allegations at the hearing of 7 flares are undocumented and inconsistent with the medical and treating records and may indicate probable exaggeration" (Tr. 16-17). Even assuming that the plaintiff suffered only one flare in July 2010, there is documentation of at least four flares in the period covered by the plaintiff in her testimony and discussed by the ALJ in his credibility analysis (*see* Tr. 17).

for further consideration, the court need not address the plaintiff's remaining issues, as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, if needed, the ALJ should also address the additional allegations of error raised by the plaintiff, including that the ALJ erred in find that her testimony was the product of leading or suggestive questioning and that the ALJ failed to properly evaluate the opinion of treating physician Dr. Silkiner.

### **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, this court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald  
United States Magistrate Judge

April 15, 2014  
Greenville, South Carolina